IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**
Plaintiff

v.

**THOMAS FARMER**
Defendant

Criminal No. 13-162 (DRD)

# OMNIBUS OPINION AND ORDER

Thomas Farmer ("Defendant") is charged with violating the Sherman Act, see 15 U.S.C. § 1, by engaging in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services. Docket No. 1. Pending before the Court are nine motions *in limine* presented by Defendant. Docket Nos. 209, 210, 212, 213, 215, 217, 219, 220, and 221. The intricacies of each of Defendant's proposed avenues for relief shall be expounded upon in seriatim fashion.

## I. MOTION TO PRECLUDE GOVERNMENT TRIAL EXHIBITS THAT VIOLATE THIS COURT'S DESIGNATION ORDER

A proper understanding of Defendant's first motion requires a brief overview of certain underlying facts. On January 27, 2014, a motion was filed to move the Court to:

> "order the Government to produce to the defense what it previously provided pretrial to the Peake defense, that is, 'a set of documents containing the universe of ***potential*** trial exhibits known to the United States at that time and a preliminary trial exhibit list' at least thirty days prior to Defendant's deadline to file in limine motions."
>
> (emphasis provided).
>
> See Docket No. 57.

This motion was granted by the Court on March 25, 2014.  See Docket No. 73.  The use of the word "potential" in said motion clearly indicates that the requested exhibit list was to be a preliminary version, as opposed to a finalized version.  The Court granted the motion under such an understanding.

Thus, the Government would not be violating this Court's directive by—in good faith and within the purposes of Federal Rule of Criminal Procedure 12(b)(4)—adding trial exhibits to this preliminary list.[1]  Further, issuing a ruling to the contrary would preclude the Government from using any of the newly acquired materials from parties and witnesses in a related civil litigation.  See Docket Nos. 148, and 206 (granting Defendant access to 08-md-1960 (DRD) under the condition that reciprocal discovery be provided to the Government).

Additionally, even if the United States was to produce new evidence at the eleventh hour, the proper remedy is to provide additional time to the purportedly aggrieved party to cure any alleged prejudice rather than to entirely exclude the materials at issue.  See United States v. Sepulveda, 15 F.3d 1161 (1st Cir. 1993) ("When discovery material makes a belated appearance, a criminal defendant must ordinarily seek a continuance if he intends to claim prejudice."); United States v. Guzman, 282 F.3d 56, 59 (1st Cir. 2002) ("the law frowns on the exoneration of a defendant for reasons unrelated to his guilt or

---

[1] Fed. R. Crim. P. 12

(4) Notice of the Government's Intent to Use Evidence.

> (A) At the Government's Discretion. At the arraignment or as soon afterward as practicable, the government may notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(3)(C).
>
> (B) At the Defendant's Request. At the arraignment or as soon afterward as practicable, the defendant may, in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(C), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may be entitled to discover under Rule 16.

innocence, and, accordingly, the power to dismiss charges based solely on government misconduct must be used sparingly . . . At the very least, [to demonstrate prosecutorial misconduct] the defendant must show that the challenged conduct violates commonly accepted norms of fundamental fairness and is shocking to the universal sense of justice."); United States v. Santana, 6 F.3d 1, 10 (1st Cir. 1993) ("While we have expressed the view that courts should be willing to consider invoking their supervisory powers to secure enforcement of better prosecutorial practice and reprimand of those who fail to observe it, we have repeatedly cautioned that such powers must be used sparingly. Potent elixirs should not be casually dispensed.") (internal citations and quotations omitted); Id. ("[I]n a case-specific context, society's interest in adjudicating guilt and innocence on full information outweighs its interest in punishing governmental misconduct directed against third parties.") (citing United States v. Payner, 447 U.S. 727, 736 (1979)); United States v. Osorio, 929 F.2d 753, 757-758 (1st Cir. 1991). Such public policy is consistent with ensuring that all matters, civil and criminal, are properly resolved squarely on the merits.

In any event, the Court hereby **DENIES** Defendant's motion to bar the Government "from introducing trial exhibits that were not identified or tendered to the defense on May 28, 2014." See Docket No. 209.

## II.  MOTION FOR AN *IN LIMINE* ORDER PROHIBITING THE GOVERNMENT FROM SEEKING OPINION TESTIMONY ON CRIMINAL LAW ISSUES

In support of this motion, Defendant lists dozens of instances where the Government allegedly sought opinion testimony on criminal-law issues in the *Peake* trial.

The motion in question is an attempt to disallow the Government from mirroring this tactic in the upcoming trial. Defendant cites several legal opinions in an effort to persuade this Court to rule in their favor. Most notably, Defendant cites United States v. Delgado-Marrero, 744 F.3d 167, 208-09 (1st Cir. 2014); United States v. Baskes, 649 F.2d 471, 478-79 (7th Cir. 1980); and United States v. Espino, 32 F.3d 253 (7th Cir. 1994).

The common ground of these circuit cases is that a lay-opinion witness should not be asked—or allowed to answer—questions that require an admission of culpability to the charges. A cautious reading of these cases demonstrates how certain questions may implicitly require expert knowledge before being answered. For the sake of clarity, the inappropriate questions of each of these cases are enclosed below:

> "The government began its cross-examination of [Defendant] by immediately asking whether she admitted to participating in the drug transaction. She agreed, saying, 'I've admitted I did it, as I said, and I repeat, because of [the undercover officer's] insistence and because of the relationship, the sentimental or romantic relationship I had with him and my trust in him.' Hearing that, the government pressed her further: **'So you admit every count in this Indictment; is that correct?'** [Defendant] responded, **'I was there, I repeat, I didn't—.'** The district judge cut her short, interjecting, **'[t]he question is whether—we want an answer whether you admit all the charges that are against you in this accusation. That's all.'"** (emphasis provided).
>
> Delgado-Marrero, 744 F.3d at 209.

> On cross-examination defendant's counsel asked Hammerman [a government cooperater]:
>
> **Mr. Hammerman, did you unlawfully, knowingly and wilfully conspire to defraud the United States together with Sam Zell, Roger Baskes and/or Burton Kanter?**
>
> **Mr. Hammerman, did you unlawfully, knowingly and wilfully combine and agree together with Roger Baskes, Burton Kanter and Sam Zell to defraud the United States of America?** (emphasis provided).
>
> Baskes, 649 F.2d at 478-79.

> On cross-examination [Defendant] testified as follows:
>
> Q. Okay. But you did deals with Robles involving cocaine and marijuana?

> A. That's right.
>
> Q. You had a continuing relationship with Mr. Robles where you supplied him with drugs in the spring of 1991?
>
> A. That was three times that I gave him drugs.
>
> Q. So that's a continuing relationship; correct?
>
> A. Well, after that he disappeared and I never knew what happened to him.
>
> Q. Okay. But it was more than one deal; right?
>
> A. I am telling you very clearly that it was three times.
>
> Q. **Essentially what you're doing here today . . . is you're admitting the conspiracy; aren't you?**
>
> . . .
>
> [Defense counsel]: I object to this question and answer. It's a legal conclusion and I object to any questions continuing to call for legal conclusions. It's beyond the scope of this witness.
>
> THE COURT: That's—
>
> [Prosecutor]: It goes to his motive for testifying right now, Judge.
>
> THE COURT: The objection is overruled. The witness is instructed to answer the question as best he can.
>
> A. **Well, if you call three times a conspiracy, fine.**  (emphasis provided).
>
> Espino, 32 F.3d at 257

These cases label these questions—which call upon a lay person to accept criminal liability to the criminal charges—as improper.

Questions may be asked to a witness taking the stand as to facts related to the case but not as to questions of law, particularly when asked to admit responsibility to a criminal violation. As the legal foundation of the aforementioned cases is solid, the instant motion to prohibit the Government from seeking lay-opinion testimony on criminal-law liability is hereby **GRANTED**.

## III. DEFENDANT'S *IN LIMINE* MOTION TO BAR LAY OPINION TESTIMONY ON ANTITRUST ISSUES

Defendant next moves to exclude any lay-opinion testimony on antitrust laws or on the economic effects of the alleged conspiracy. The foundation of Defendant's motion is built on the soil of the evidentiary rules of relevance. See Fed. R. Evid. 401-403. In spite of the detail contained in the parties' briefs, the Court prefers to reserve judgment until trial so as to be able to obtain a better overview of the context in which these questions arise. Given the number of variables, the Court finds it impractical to—at this pretrial stage—conduct the delicate balancing of the probative value of the testimony that these questions are designed to elicit against its collateral risks of undue prejudice. This motion is hereby **DENIED** without prejudice.

## IV. MOTION *IN LIMINE* TO BAR THE PROSECUTION FROM SOLICITING JUROR BIAS

Defendant switches gears and turns onto the avenue of jury bias. Defendant is adamant that the Government be prohibited from soliciting or creating bias among the jury in the upcoming trial. As the Court has previously alluded to, it is dangerous for jurors to be asked to determine the guilt or innocence of a defendant when they themselves believe to be victims of the alleged crime. Thus, as the jury will consist of residents of Puerto Rico, the Court will not allow the Government to argue that the alleged price-fixing scheme resulted in higher consumer prices for the residents of Puerto Rico.

In support of their position, the defense details several instances where the Government purportedly crossed this line in the *Peake* trial. The Court disagrees with this

premise. During the *Peake* trial, the Court explicitly—and on numerous occasions—disallowed the Government from arguing and/or eliciting testimony that would inform the jury of the impact that the alleged conspiracy had on the residents of Puerto Rico.[2] Instead, the Government properly argued in *Peake*—and has averred that it will make similar arguments in this case—that the victims of the conspiracy were the companies and government agencies that purchased price-fixed freight services from the conspiring shipping companies. The Government did not argue—and will not be allowed to argue—that the higher prices borne by these entities were subsequently passed onto individual consumers.[3] Thus, to that extent, this motion is **GRANTED**.

## V. MOTION *IN LIMINE* TO BAR PROSECUTION FROM INTRODUCING EVIDENCE OF A BID RIGGING CONSPIRACY, A MARKET ALLOCATION CONSPIRACY, AND/OR AN ILLICIT GOVERNMENT CONTRACT CONSPIRACY

The Government has charged Thomas Farmer with participating in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services. However, the Government has maintained that this price-fixing scheme is only one of several means and methods used to achieve the objectives of the overarching conspiracy. For that reason, Defendant avers that the Government should be forbidden from introducing evidence that is unrelated to the price-fixing aspect of the conspiracy. The Government takes the opposite approach.

---

[2] Moreover, the Court will provide the same stern warnings to the Government during the instant proceedings.

[3] Notwithstanding, the Court recognizes that this there is a thin line between both of these arguments.

While conceding that Defendant did not participate in each and every aspect of the overarching conspiracy, the Government takes the position that Defendant's participation in the conspiracy was not limited to price fixing. In fact, the Government asserts that evidence will be offered at trial of Defendant's unlawful agreement with his competitors to allocate customers. The second prong of the Government's opposition is that granting this motion would deprive the Government from presenting evidence about what the other coconspirators were doing in furtherance of this conspiracy or about other overt acts within the conspiracy.

The Court would be far better situated to rule on this matter when presiding over the fact-specific context of trial. In an abundance of caution, the Court will take a wait-and-see approach until trial in order to properly scrutinize the specific evidence offered by the Government at trial. Without knowledge of the particulars of the Government's evidence, any evidentiary ruling would be based on incomplete data. Therefore, the Court hereby **DENIES** this motion without prejudice. Defendant may reformulate objections of this nature at trial.

### VI. MOTION TO EXCLUDE BUNKER FUEL SURCHARGE EVIDENCE

The proposal to exclude evidence of bunker-fuel surcharges is premised on various interrelated contentions. Although the motion is somewhat vague, the Court segregates all of its cognizable arguments into separate subsections.

#### A. Applicability of the Filed Rate Doctrine to Antitrust Crimes

"Courts often trace the filed rate doctrine to Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156 . . . (1922)." McCray v. Fidelity Nat. Title Ins. Co., 682 F.3d

229, 235 (3d Cir. 2012). *Keogh* was a civil antitrust case in which "a shipper alleged that certain railroad carriers conspired to fix freight transportation rates in violation of the Sherman Act." Id. (citing Keogh, 260 U.S. at 160-01). "The shipper sought damages based on the unusually high rates." Id. (citing Keogh, 260 U.S. at 160-01). The Supreme Court denied the shipper's claim because the challenged rates were previously authorized by the Interstate Commerce Commission ("ICC"). The Third Circuit impeccably summarized the Supreme Court's reasoning as follows:

> The Court reasoned that it would be improper to hold carriers civilly liable for enforcing rates that the ICC had already approved as legal. Id. at 162–63, 43 S.Ct. 47. In addition, the Court expressed a concern about rate discrimination, stating that the shipper's potential damages "might, like a rebate, operate to give him a preference over his trade competitors." Id. at 163, 43 S.Ct. 47. Finally, the Court considered the impracticability of awarding damages based on a lower hypothetical rate, which would require "reconstituting the whole rate structure"—a task that the Court viewed the ICC as more competent to handle. Id. at 164, 43 S.Ct. 47 ("[I]t is the Commission which must determine whether a rate is discriminatory; at least, in the first instance.").
>
> McCray, 682 F.3d at 236

Sixty-four years later, in Square D Co. v. Niagara Frontier Tariff Bureau Inc., 476 U.S. 409 (1986), the Supreme Court reapplied the filed-rate doctrine to a civil antitrust case to disallow a damages claim even when the challenged rates were approved by the ICC without a formal hearing. Further, in a separate case, the Supreme Court succinctly described the origins and interpretation of the filed-rate doctrine as follows:

> The filed rate doctrine has its origins in this Court's cases interpreting the Interstate Commerce Act, see, e. g., Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520–521, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939); Pennsylvania R. Co. v. International Coal Co., 230 U.S. 184, 196–197, 33 S.Ct. 893, 895–896, 57 L.Ed. 1446 (1913), and has been extended across the spectrum of regulated utilities. "The considerations underlying the doctrine ... are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated

companies charge only those rates of which the agency has been made cognizant."
City of Cleveland v. FPC, 174 U.S.App.D.C. 1, 10, 525 F.2d 845, 854 (1976). See
City of Piqua v. FERC, 198 U.S.App.D.C. 8, 13, 610 F.2d 950, 955 (1979).

Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78 (1981).

However, the Supreme Court has always been cautious about overextending the filed-rate doctrine:

> Petitioners correctly point out that cases like [Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213 (1966)] make it clear that collective ratemaking activities are not immunized from antitrust scrutiny simply because they occur in a regulated industry, and that **exemptions from the antitrust laws are strictly construed and strongly disfavored.** Nevertheless, even if we agreed that *Keogh* should be viewed as an "antitrust immunity" case, we would not conclude that later cases emphasizing the necessity to strictly construe such immunity rendered *Keogh* invalid. For *Keogh* represents a longstanding statutory construction that Congress has consistently refused to disturb, even when revisiting this specific area of law.
>
> We disagree, however, with petitioners' view that the issue in *Keogh* and in this case is properly characterized as an "immunity" question. **The alleged collective activities of the defendants in both cases were subject to scrutiny under the antitrust laws by the Government <u>and to possible criminal sanctions</u> or equitable relief.** *Keogh* simply held that <u>an award of treble damages is not an available remedy</u> for a private shipper claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation. <u>Such a holding is far different from the creation of an antitrust immunity</u>, and makes the challenge to *Keogh's* role in the settled law of this area still more doubtful.

(emphasis in bold is provided; footnotes omitted).

Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409 (1986).

Herein lies the flaw in Defendant's contention. The fact that these allegedly price-fixed surcharge rates were approved by the regulating agency does not necessarily shield Defendant from criminal liability. The filed-rate doctrine is not quite the protective cloak that the defense touts it to be. This request is **DENIED**.

**B. Applicability of the *Per Se* Probatory Scheme to a Price Fixing of Surcharges Crime**

In construing § 1 of the Sherman Act, the Supreme Court has never "taken a literal approach to [its] language." Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) (reiterated in Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007)). A contrary interpretation could have the effect of rendering "all contracts" unlawful under the sweeping language of § 1. Leegin, 551 U.S. at 885 (citing Texaco, 547 U.S. at 5; and Board of Trade of Chicago v. United States, 246 U.S. 231, 238 (1918)). Hence, "the Court has repeated time and again that § 1 'outlaw[s] only **unreasonable** restraints.'" (emphasis provided). Leegin, 551 U.S. at 885 (citing State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)). In general, therefore, an antitrust case must be proved by way of the *rule of reason*. However, there are cases where the *rule of reason* is superseded by the *per se rule*. The Supreme Court fully covers the nuances and interplay of both of these rules in the following manner:

> The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1. See Texaco, *supra*, at 5, 126 S.Ct. 1276. "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Appropriate factors to take into account include "specific information about the relevant business" and "the restraint's history, nature, and effect." Khan, *supra*, at 10, 118 S.Ct. 275. Whether the businesses involved have market power is a further, significant consideration. See, *e.g.*, Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (equating the rule of reason with "an inquiry into market power and market structure designed to assess [a restraint's] actual effect"); see also Illinois Tool Works Inc. v. Independent Ink, Inc., 547 U.S. 28, 45–46, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). **In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.**
>
> **The rule of reason does not govern all restraints. Some types "are deemed unlawful *per se*."** Khan, *supra*, at 10, 118 S.Ct. 275. The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work, Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); and, it must be acknowledged, the *per se* rule can give clear guidance for certain conduct. **Restraints that are *per se* unlawful include horizontal agreements among competitors to fix prices, see Texaco,**

> **supra, at 5, 126 S.Ct. 1276, or to divide markets, see <u>Palmer v. BRG of Ga., Inc.</u>, 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (*per curiam*).**
>
> **Resort to *per se* rules is confined to restraints, like those mentioned, "that would always or almost always tend to restrict competition and decrease output." Business Electronics, supra, at 723, 108 S.Ct. 1515 (internal quotation marks omitted). To justify a *per se* prohibition a restraint must have "manifestly anticompetitive" effects, GTE Sylvania, supra, at 50, 97 S.Ct. 2549, and "lack ... any redeeming virtue," <u>Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.</u>, 472 U.S. 284, 289, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (internal quotation marks omitted).**
>
> As a consequence, the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, see <u>Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.</u>, 441 U.S. 1, 9, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), and only if courts can predict with confidence that it would be invalidated*887 in all or almost all instances under the rule of reason, see <u>Arizona v. Maricopa County Medical Soc.</u>, 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). It should come as no surprise, then, that "we have expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious." <u>Khan</u>, *supra*, at 10, 118 S.Ct. 275 (internal quotation marks omitted); see also <u>White Motor Co. v. United States</u>, 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (refusing to adopt a *per se* rule for a vertical nonprice restraint because of the uncertainty concerning whether this type of restraint satisfied the demanding standards necessary to apply a *per se* rule). And, as we have stated, a "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." <u>GTE Sylvania</u>, *supra*, at 58–59, 97 S.Ct. 2549.
>
> (emphasis provided).
>
> <u>Leegin</u>, 551 U.S. at 885-86

Entering the discussion, the First Circuit asserted that not all price-fixing schemes fall under the *per se rule*. "The only price-fixing agreements that are condemned *per se*, with one narrow exception (minimum resale price-fixing), are agreements (1) between competitors (2) as to competing products or services (3) where, in addition, the agreement is not part of a larger, legitimate economic venture." <u>Augusta News Co. v. Hudson News Co.</u>, 269 F.3d 41, 47 (1st Cir. 2001) (citing <u>Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.</u>, 441 U.S. 1 (1979)).

Defendant avers that the *per se rule* should not apply to a conspiracy to fix surcharge prices. The Court is unpersuaded. The charged price-fixing conspiracy—even when limited to the price fixing of surcharges—is: (1) between competing freight-carrier providers (2) as to competing freight-carrier services (3) where the agreement cannot reasonably be considered a part of a legitimate economic venture. Moreover, the Supreme Court has been clear that "[r]estraints that are *per se* unlawful include horizontal agreements among competitors to fix prices." Leegin, 551 U.S. at 885-86 (citing Texaco, 547 U.S. at 5). The Court considers the instant case to potentially fall within said category. However, the final determination will be made initially by the Court to determine if the threshold is met and the matter may be allowed to be determined by the jury. Finally, the fact that these surcharges were approved by the appropriate regulating agency does not preclude the applicability of the *per se rule*. Therefore, a **DENIAL** is required.

### C. Due Process and Vagueness

Defendant next relies on the Due Process Clause and the *vagueness doctrine* in an effort to persuade the Court to disallow evidence of bunker-fuel surcharges. Specifically, Defendant purports that the Government seeks to authorize the bunker-fuel surcharges while simultaneously punishing Crowley and its employees for violating antitrust laws with respect to these same surcharge rates. However, as pointed out by the Government, the flaw in Defendant's Due Process argument is that "the Sherman Act prohibits collusive agreements, not specific prices." See Docket No. 238, p. 12. Hence, there is no inconsistency between the approval of surcharge prices and the prosecution of illicit antitrust agreements that merely involve bunker-fuel surcharges. Further, for these same

reasons, the Court finds no reason to deem the challenged statutory arrangement vague. These requests are **DENIED**.

### D. Statute of Limitations

The applicable statute of limitations for the case at bar is five (5) years. See 18 U.S.C. § 3282(a). Therefore, as the indictment was filed on March 21, 2013, Defendant's alleged criminal conduct must have persisted at least until March 21, 2008 in order for the indictment to be timely. The indictment avers that the charged conspiracy ended on April 17, 2008, which was when the Government conducted a search of Crowley's headquarters. Conversely, Defendant contends that, with respect to surcharges, the last act of the alleged price-fixing conspiracy occurred on November 27, 2007, which is the last time that Crowley's application for fuel surcharges matched another entity's application. However, devoid of evidence at this pretrial stage, the Court must rely on the allegations of the indictment. "If . . . factual matters are involved, such as when a conspiracy ended or when an offense was consummated, the limitations question can properly be put off until the trial." 1A Wright & Leipold, Federal Practice and Procedure § 193 (4th ed.) (collecting cases). Therefore, because the indictment alleges that the surcharge conspiracy was not unplugged until April 17, 2008, the Court must **DENY** Defendant's motion without prejudice.

### VII. MOTION TO EXCLUDE EVIDENCE OF PAYMENT STUBS

Relying on the preliminary exhibit list, the defense presumes that the Government will attempt introduce evidence that Defendant received added employment compensation

and bonuses as a result of conspiring to fix prices. Defendant contends that this evidence should be excluded under Federal Rule of Evidence 403. However, as previously alluded to, the Court must be cautious when conducting the delicate balancing act between the probative value of a piece of evidence against its potential to cause undue prejudice as required under Rule 403. This balancing act is to be performed "on the spot."

The exclusion of evidence is not the general rule; to the contrary, the "trial court's discretion to exclude relevant evidence under Rule 403 should be exercised with recognition that exclusion is **extraordinary and to be invoked sparingly.**" (emphasis in original). Joseph W. Cotchett, Federal Courtroom Evidence § 403.2.1 (Mathew Bender, 5th Ed.); Harrington v. Hiller, 883 F.2d 411, 414 (5th Cir. 1989) ("probative evidence should be 'sparingly' excluded"); United States v. Grant, 256 F.3d 1146, 1155 (11th Cir. 2001) ("Rule 403 is extraordinary remedy whose 'major function . . . is limited to excluding matter of scant or cumulative probative force . . .'"); United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003) ("trial court's discretion to exclude relevant evidence under Rule 403 should be exercised with recognition that exclusion is extraordinary and to be invoked sparingly, with trial court striking the balance in favor of admission in most cases"). For the Court to exclude probative evidence it must be substantially outweighed by the risk of unfair prejudice. See Rubert-Torres v. Hospital San Pablo, Inc., 205 F.3d 472 (1st Cir. 2000) ("Federal Rules favor admitting evidence, so exclusion is measure of last resort for possibly prejudicial evidence."). However, "Rule 403 as finally enacted was less stringent than the original version, which would have mandated exclusion if the probative value of evidence was outweighed by the risks of prejudice." Dente v. Riddell, Inc., 664 F.2d 1, 5 (1st Cir. 1981) (citing 1 Weinstein's Evidence P 403(01), at 4-5 (1980)). "Assuming, even

so, that the trial court's discretion is reviewable for abuse, the court still retains considerable discretion to exercise judgment as to what evidence in this category to admit and what to exclude." Id. (collecting cases). Finally, trial courts are "virtually always" in a better position to assess the admissibility of the evidence. Sprint/United Management Co. v. Mendelsohn, 552 U.S. 379, 387 (2008).[4]

With the limited information available at this pretrial stage, the Court cannot be certain that this evidence should be excluded. The Court notes that bonuses based on participation provide evidence of motive and intent in the alleged conspiracy. Therefore, the motion is **DENIED** without prejudice until the necessary factual backdrop is developed at trial.

### VIII. MOTION TO BAR ADMISSION OF PLEA AGREEMENTS

This filing is partially a motion for reconsideration of a prior order. For the sake of clarity, the Court encloses the relevant portion of said order below:

> . . .
> The Court hereby authorizes the Government to introduce evidence of coconspirator witnesses' guilty pleas and plea agreements at trial provided that the Court provides the jury with a cautionary instruction.[5] See United States v. Thompson, 449 F.3d 267, 274 (1st Cir. 2006); United States v. Dworken, 855 F.2d 12, 30 (1st Cir. 1988) (evidence of witness's guilty pleas is admissible to "dampen the effect of an anticipated attack on the witness's credibility" provided jury is so instructed). Additionally, the Government may comment on the guilty pleas and the plea agreements during its opening and closing arguments. See United States v. Ladd, 877 F.2d 1083, 1088 (1st Cir. 1989) (quoting United States v. Magee, 821 F.2d 234, 241 (5th Cir. 1987) ("The government was entitled to outline for the jury its expected evidence which included testimony by convicted co-conspirators; thus, the disclosure [about their guilty pleas and status as convicted co-conspirators] served a

---

[4] All cited parentheses in this paragraph are direct quotes from the treatise: Federal Courtroom Evidence, *supra*.

[5] Prior to the commencement of trial, the Court will hold a conference to discuss an effective curative instruction.

> legitimate purpose...."); United States v. Hansen, 434 F.3d 92, 102 (1st Cir. 2006) (finding no improper vouching when the prosecution mentioned a witness' plea agreement during its closing). Finally, the defense may also mention any potential interests that the witnesses may have in diminishing their sentence.
> . . .
>
> Docket No. 122.

At the outset, the Court notes that—despite Defendant's arguments to the contrary—it shall stand by this order. However, Defendant also argues matters that may not be covered by said order.

The parties' arguments really come down to the form and context in which these plea agreements hypothetically should or should not be admitted into evidence. However, it is counterproductive for the Court to list the endless permutations under which these plea agreements should or should not be admitted in a Court of law. Thus, after thorough consideration and careful scrutiny of the briefs, the Court finds that any matter related to the admissibility of plea agreements that is not covered by the prior order is best left for the battlefield of trial. The Court will be better equipped to rule on such issues after observing the context in which these plea agreements are offered into evidence at trial. This motion is hereby **DENIED** without prejudice.

### IX.     MOTION TO EXCLUDE PHONE RECORDS

Finally, the defense attempts to persuade this Court to exclude the records of phone calls between Defendant and his boss, Rob Grune. The defense speculates that the Government will attempt to implicate Rob Grune as a member of the conspiracy and, hence, use these records to associate Defendant with the conspiracy as well. Defendant

proposes that these phone records must be excluded as being irrelevant, see Fed. R. Evid. 401-402; unduly prejudicial, see Fed. R. Evid. 403; inadmissible hearsay, see Fed. R. Evid. 801, *et seq.*; and inadmissible testimonial evidence, see <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), and its progeny.

However, instead of indulging Defendant's mere speculation, it is preferable to evaluate the admissibility of this evidence in a trial environment where the Court has a superior vantage point. Notwithstanding, even from the pretrial perspective, it is doubtful that these phone records will prove to be inadmissible hearsay or be in contravention with the Confrontation Clause as they, at least, constitute circumstantial evidence as frequent communications with another coconspirator during the conspiracy and may potentially be in furtherance of the conspiracy. Nevertheless, this motion is **DENIED** without prejudice.

## X.   CONCLUSION

The rulings on each of Defendant's petitions for relief may be summarized as follows: (a) the motion to prohibit the Government from seeking lay-opinion testimony on criminal-law issues, see Docket No. 210, is hereby **GRANTED** but only as to questions posed to a lay witness taking the stand as to facts related to the case, not as to questions of law; (b) Defendant's motion to bar the prosecution from soliciting juror bias, see Docket No. 213, is hereby **GRANTED** but only to the extent that the Government will be disallowed from arguing that the higher prices borne by the third-party entities were subsequently passed onto individual consumers; and (c) all other motions and requests

are hereby **DENIED** without prejudice in order to be discussed "on the spot" in a timely fashion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 10th day of April, 2015.

/s/ DANIEL R. DOMINGUEZ
DANIEL R. DOMINGUEZ
U.S. District Judge